IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DIVISION


ALLEN DOUGLAS HALE, III,
        Plaintiff,


VERSUS                  CIVIL ACTION NO: 1:16-cv-113-LG-RHW


CITY OF BILOXI, MISSISSIPPI;
KENNETH GARNER, Individually;
DARREN LEA, Individually; and
JOHN AND JANE DOES 2-10,
Individually,
        Defendants.


DEPOSITION OF MICHAEL SHAW

Taken at Biloxi Public Safety Building,

170 Porter Avenue, Biloxi, Mississippi,

on Tuesday, April 4, 2017, beginning

at 11:09 a.m.

EXHIBIT
tabbies "A"

1    A.    Correct.

2    Q.    All right.  And, ultimately, did a judge

3    approve and issue an arrest warrant for Doug Hale?

4    A.    That's correct.

5    Q.    And did a judge approve and issue an

6    arrest warrant for Nadine Tozer?

7    A.    That's correct.

8    Q.    And what judge was that?

9    A.    According to the signatures, Bruce

10   Strong.

11   Q.    Do you remember or can you state for the

12   record the day that the arrest warrant was issued?

13   A.    2 March 2015.

14   Q.    Okay.  So that would have been the same

15   day that you made the affidavit for the arrest

16   warrant; correct?

17   A.    Correct.

18   Q.    What is the Biloxi Police Department

19   protocol when an arrest warrant is issued for a

20   suspect in a case -- in a felony case?  And I'll

21   use this term, a minor felony.  What I mean by

22   that is I'm excluding murder, sexual battery,

23   rape, child crimes, things like that.  What is the

24   protocol on a case such as this for unauthorized

25   use of a credit card or debit card?  How does it

1      A.   After the warrant, telephone.

2      Q.   Well, let me ask you this:  How long

3   after the warrant was issued?  When did you have

4   telephonic contact with him?

5      A.   How long after?

6      Q.   Or basically when did you have

7   telephonic contact with him post issuance of the

8   arrest warrant?

9      A.   The day of the arrest warrant.

10      Q.   The day of the arrest warrant?

11      A.   Uh-huh.

12      Q.   Okay.  Did you call him, or did he call

13   you?

14      A.   I think one of each.

15      Q.   So you talked to him twice?

16      A.   I talked to him numerous times.

17      Q.   Okay.  But I'm talking about when you

18   talked to him post arrest warrant.

19      A.   Correct, numerous times.

20      Q.   I asked you when did you have contact

21   with him, so you're saying numerous times?  Let me

22   rephrase.

23      A.   From the day on.

24      Q.   Say that one more time.

25      A.   I talked to him the day of issue and the

1  days following.

2      Q.   And when you say "the days following,"

3  what days are you referring to?

4      A.   That week specifically, that was a

5  Monday, the 2nd.  I would say probably through the

6  3rd, 4th, and then I can't be specific from that

7  point until the day of the arrest.  It was a lot

8  of times, a lot of conversations with a lot of

9  people.

10      Q.   What other people were you talking to?

11      A.   I spoke to several people.  I spoke to

12  Ms. Clark several times.  I spoke to several

13  people calling from the trailer park who was aware

14  that Hale was being looked for for these warrants.

15      Q.   That who was being looked for?

16      A.   Mr. Hale.

17      Q.   Okay.

18      A.   Several people called me via dispatch.

19  They would patch them through to me; I've got

20  somebody wanting to talk to you in reference to a

21  warrant.  Well, that could be numerous cases, but

22  in the back of the trailer park, Mazalea.

23      Q.   What phone number did you use whenever

24  you talked to Doug?

25      A.   I don't recall which phone number I

1    any, did you have with Doug?

2        A.    Spoke to him on Wednesday, whatever date

3    that was, Wednesday before.

4        Q.    Before the arrest warrant was issued?

5        A.    Arrest warrant was issued on Monday.

6        Q.    Did you speak to him in person or on the

7    phone?

8        A.    In person.

9        Q.    Where was that?

10       A.    Mazalea Trailer Park, in the office.

11       Q.    Inside or outside?

12       A.    Both.

13       Q.    And who else was present?

14       A.    At the time, Ms. Clark, the witness in

15   the case.  As far as any other people inside there

16   coming and going, that's why I asked him to step

17   outside, because I didn't want to spread his

18   information out to everybody.  And I spoke to him

19   just outside the door.

20       Q.    What did y'all discuss?

21       A.    Advised him who I was, identified

22   myself, gave him my business card, told him why I

23   was there, explained to him by this coming next

24   week, there was going to be a warrant for his

25   arrest, explained to him what was going on, make

1   arrangements. I couldn't give him a specific on

2   what bond would be -- I gave him a general,

3   usually between 10 and 50,000 -- until I have the

4   warrant issued, but it's coming first of next

5   week. Start making arrangements to come turn

6   yourself in.

7       Q.   Did you ask him anything about the facts

8   of the case or the allegations that were being

9   made?

10      A.   The only comment I made other than that

11  about taking care of this was the fact that -- him

12  to get in contact with Nadine and let her know

13  she's got one coming, too.

14      Q.   You didn't ever ask him anything with

15  respect to what his involvement in it was, how

16  that came about?

17      A.   No. The only other comment that was

18  conversation was inside when he went to pick up a

19  package. The reason why I was there, Ms. Clark

20  had contacted me to let me know. After I had

21  gotten her statement -- I dropped off a statement

22  form for her, picked the statement form back up,

23  and had her contact me if he was going to pick up

24  a package, which she did.

25          While I was there, he went to pick it

1    television, whatever was going on.

2        Q.    So nothing pertaining to Nancy Robinson

3    or Nadine Tozer or anybody involved?

4        A.    No.

5        Q.    You didn't say to him, was she worth it?

6        A.    No.

7        Q.    Okay.  Now, in Investigator Shaw's

8    report, it says here that you told him that you

9    spoke with Doug on March 31st, 2015, the day prior

10   to the shooting incident, and advised him he had a

11   felony warrant that had been issued and needed to

12   turn himself in.  Do you remember saying that to

13   Investigator Shaw?

14       A.    I am Investigator Shaw.

15       Q.    Excuse me.  Investigator Shoemaker.  I'm

16   sorry.  It's getting all squirrely on me.

17       A.    I remember talking to him several times,

18   yes, telling him, you know, we need to take care

19   of this, we need to take care of this.

20       Q.    So you remember telling Investigator

21   Shoemaker that you spoke with Doug the day before

22   the shooting?

23       A.    Yes.  Yes.

24            MR. ROS:  Chris, can we take a quick

25       break?