1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DIVISION


ALLEN DOUGLAS HALE, III,
    Plaintiff,


VERSUS            CIVIL ACTION NO: 1:16-cv-113-LG-RHW


CITY OF BILOXI, MISSISSIPPI;
KENNETH GARNER, Individually;
DARREN LEA, Individually; and
JOHN AND JANE DOES 2-10,
Individually,
    Defendants.


### DEPOSITION OF KENNETH GARNER

Taken at the Law Office of Russell S. Gill,

638 Howard Avenue, Biloxi, Mississippi, on

Tuesday, October 25, 2016, beginning at

1:44 p.m.

**EXHIBIT**
*"B"*

1        A.    I got hired and kind of considered a

2    probationary officer, Patrolman Third Class,

3    Patrolman Second Class, Patrolman First Class,

4    narcotics investigator, and patrol sergeant, and

5    then a couple of non-ranked, non-position titles,

6    I guess, various different units in the

7    department.

8        Q.    Okay.  What are some of those units?

9        A.    K-9 and the Special Response Team, SRT.

10       Q.    What dates were you on narcotics

11   investigation?

12       A.    April of 2012 until October of 2013.

13       Q.    And so after that, you went to what

14   position?

15       A.    I went back to patrol.

16       Q.    Back to patrol?

17       A.    Yeah.

18       Q.    You were a patrol sergeant at that

19   point?

20       A.    I went back as a patrol officer, and

21   then I was promoted to patrol sergeant in January,

22   maybe February of '14.

23       Q.    And what's your current rank now?

24       A.    Patrol sergeant.

25       Q.    All right.  You know, don't tell me

1  and I don't recall them saying anything about any

2  prior violent offense.

3       Q.   Do you have the ability to run an NCIC

4  report on somebody?

5       A.   You talking about a criminal history?

6       Q.   Yes.

7       A.   We do.  We do have that.

8       Q.   Did you run a criminal history check on

9  him?

10      A.   I did not.

11      Q.   Now, tell me about prior to your arrival

12  at the Mazalea RV Park where the incident

13  occurred.  In your own words, tell me what

14  happened when you were first contacted or informed

15  about his arrest warrant.

16      A.   I was at the police department doing

17  something with reports or computers or something.

18  Dispatch called me and said that a person that

19  lived at Mazalea RV had called and said that he

20  was there and that he had a warrant, and they told

21  me that they had verified he had an active felony

22  credit card warrant.

23      Q.   And why did they contact you about that?

24      A.   I was one of the supervisors that were

25  working.  Basically, they called the desk phone,

1    and I happened to be sitting at the desk.

2        Q.    Okay.  What was your next step after

3    that?

4        A.    I made sure, you know, verified and

5    confirmed the warrant, and I told them to send

6    three officers up there when one became available.

7        Q.    Were any officers available?

8        A.    We were a little bit busy at the time,

9    so it was a minute before anybody was available.

10        Q.    Okay.  And who ultimately became

11    available?

12        A.    After I finished what I was doing, I

13    decided to go up to the RV park; and ultimately it

14    ended up being me and Darren Lea, another patrol

15    sergeant, and Robert McKeithen, who is a patrol

16    officer.

17        Q.    Did you speak with either Darren Lea or

18    Robert McKeithen on the phone or on the radio

19    prior to meeting with them in person?

20        A.    Yeah, we met at Southern Tire Mart,

21    which is just right there by the trailer park.

22        Q.    How far away from the trailer park was

23    that?

24        A.    I'm pretty sure the property butts up to

25    each other.

1    Q.    Why did y'all meet there?

2    A.    It was a close spot to get all three of

3    us together and to kind of formulate an arrest

4    plan.

5    Q.    Okay.  And what was the arrest plan that

6    y'all formulated?

7    A.    Basically, I showed them the picture

8    that we had in our Record Management System.  And

9    we basically decided that McKeithen would go to

10    the far side, non-door side of the trailer,

11    opposite of the door, to make sure there was no

12    escape routes, and then Darren and I would go to

13    the door.

14    Q.    The far side, I guess, of the RV, would

15    that be the driver's side in this instance?

16    A.    Yeah, I believe it was the driver's

17    side.

18    Q.    Who is the senior officer out of the

19    three of you?

20    A.    You mean by rank or by time in service?

21    Q.    Well, I guess, who was the leader of the

22    three of you going to serve this arrest warrant?

23    A.    I guess I was just by default.

24    Q.    Had you ever encountered Doug prior to

25    April 1st, 2015?

1       A.    No.

2       Q.    Had you ever been to Mazalea RV Park

3    prior to April 1st, 2015?

4       A.    Yeah.

5       Q.    What had you been there for?

6       A.    You know, working as a patrol officer,

7    I'd ride through there.  I mean, I'm sure I had

8    went to some domestics.  I mean, I don't remember

9    specifics, but I had been through there before.

10       Q.    Had you ever made an arrest out there?

11       A.    It seems that I have, but I can't recall

12    specifics.  I know that there was -- I remember

13    there being a stolen RV out there.  I remember

14    some drug arrests.  I don't remember specifically

15    being involved in those arrests, but I remember

16    that those arrests had happened.

17       Q.    Had you ever served an arrest warrant

18    with Darren Lea prior to April 1st, 2015?

19       A.    I'm sure I have.  Again, I don't

20    remember specifics.

21       Q.    How many arrest warrants have you served

22    at a residence during your 14 years with Biloxi?

23    You can approximate.  I know that's a long time.

24       A.    I couldn't even approximate.

25       Q.    Hundreds?

1    A.    Probably.  I'm sure in the hundreds.

2    Q.    200?

3    A.    I could tell you that when I was working

4    narcotics, we did about 200 search and arrest

5    warrants in one year.  And the only reason I know

6    those numbers is because we tracked them, but I

7    don't go around keeping up with those kind of

8    numbers.

9    Q.    Understandable.  Would you agree with me

10    there's different types of crimes out there?

11    A.    Yes.

12    Q.    Okay.  Some crimes are violent crimes,

13    or are they classified as violent crimes?

14    A.    There are some crimes classified as

15    violent, yes.

16    Q.    What's an example of a violent crime?

17    A.    Robbery, sexual assault, homicide,

18    aggravated assault.  Simple assault can be

19    classified as a violent crime even though it's a

20    misdemeanor.  Domestic assault can be classified

21    as a violent crime even though it's a misdemeanor.

22    Federally, burglary of a dwelling can be

23    classified as a violent crime even if no one was

24    at the house.  So there's different kinds of

25    violent crimes.

1   small trailer park asking about him, I was fairly

2   certain that information had gotten to him.

3           So when we got to Lot 26, McKeithen was

4   first, and then I was second, and Darren was

5   behind us.  And we started to execute the plan

6   that we had formulated, which was that McKeithen

7   went around, I guess, the driver's side, would be

8   a better description, and Darren and I began to

9   approach the door.

10      Q.    Okay.  What happened as you started to

11  approach the door?

12      A.    This area is pretty dark at night.  So

13  McKeithen was in front of me and off to the right

14  a little bit, and I could see the windshield of

15  the RV.  And there was a screen that was pulled

16  down over the windshield, but the lights were on

17  inside the RV which allowed me to see into the RV.

18  And I could see Mr. Hale sitting by a window on

19  the left side.

20          So McKeithen was already -- by the time

21  I realized this was fairly close to rounding the

22  side.  And, of course, like I said, it was pretty

23  dark, so he took his -- he had his flashlight in

24  his hand, and he did what was called painting the

25  area with light.  So he just kind of turns his

 1    light on real quick and paints the area, you know,

 2    make sure there's nobody there and make sure

 3    there's nothing you're going to trip on and that

 4    kind of stuff.

 5        Q.    Okay.  Did you see Doug do anything when

 6    McKeithen painted the area with his flashlight?

 7        A.    Yeah.  He was sitting facing kind of

 8    toward the front of the RV, and he took his hand,

 9    and he leaned over, and he pulled the blinds back,

10    and he just kind of peeked out the window.

11        Q.    Okay.  Did you think anything about

12    that?

13        A.    I did.  Again, I was thinking that he

14    probably was aware that he had a warrant and was

15    probably hyper-alert to people coming around the

16    RV thinking that, you know, the police are going

17    to be coming to look for him.

18        Q.    So because there was a flashlight

19    outside, you think he knew he had a warrant and

20    that the police were coming?

21        A.    That's not what I said.

22        Q.    So why did it make you think if he

23    looked outside the blinds that something was

24    wrong?

25        A.    Well, as I said earlier, when I learned

1    that investigators had been in this small RV park

2    asking about him for days, I made the inference, I

3    guess is the word I'm looking for, that he was

4    probably aware that he had a warrant because of

5    how small the area was and how he -- in my

6    experience as an investigator, once you start

7    asking about people that you're looking for, they

8    become aware of it very quickly.

9            So when he looked out the window, I'm

10   not saying that the sight of the flashlight made

11   him think the police were there.  I said, my

12   thought process was that he was probably aware he

13   had a warrant and was probably a little more alert

14   to people being around the trailer.

15        Q.   Okay.  But you never confirmed with

16   anyone that told you that Doug knew he had a

17   warrant?

18        A.   I never spoke to anyone who said that

19   they knew that Doug knew he had a warrant.

20        Q.   Okay.  So this was just your assumption

21   that he knew that there was a warrant out for him?

22           MR. GUNN:  Object to the form.

23        A.   Again, like we said earlier, there's

24   decisions that are made, and a lot of those

25   decisions are based on training and experience.

1   And that was a decision I made based on what had

2   happened to me in the past, experiences I had had

3   in the past as a police officer.

4   BY MR. SMITH:

5       Q.   We're not talking about a decision.

6   We're talking about an inference or an assumption

7   that you made about whether or not he knew he had

8   a warrant.

9            So this was just something that based

10  upon your training and experience, as you say, you

11  thought he might know, but you did not have

12  confirmation of that?

13      A.   Which influenced the decisions we made.

14      Q.   What happened after Doug looked out the

15  blinds?

16      A.   I went to the door and went up the

17  steps, and I could see him through the door.

18      Q.   Then what did you do?

19      A.   I tried the doorknob, and it was

20  unlocked, so I opened the door and stepped off the

21  porch.

22      Q.   How far away was he when you opened the

23  door?

24      A.   From one side of an RV to another.  I

25  don't know what the distance is.  It's hard for me

1  to recall.  Not very far.

2      Q.   Okay.  Which way did the door open?  Did

3  it swing in to, basically, your left or in to your

4  right when facing the RV?

5      A.   I don't remember if it swung in or out.

6      Q.   What happened when you opened the door?

7      A.   We began to give Mr. Hale the commands

8  to come out of the RV.

9      Q.   What did you say?

10     A.   I said "police department."  I said

11 "come out."  I said "keep your hands out of your

12 pockets."  I think I said "keep your hands out of

13 your pockets" several times.  I said "come out"

14 several times.  That's pretty much what I recall

15 saying.

16     Q.   What did Sergeant Lea say?

17     A.   The only thing I really remember Darren

18 saying was initially he said that he had lethal

19 cover, and then later he said -- he told Mr. Hale

20 that he would tase him if he didn't comply.  Not

21 in those exact words, but that's the gist of what

22 he was saying.

23     Q.   When did you draw your firearm?

24     A.   I had stepped off the porch -- to the

25 best of my recollection, I had stepped off the

1      A.    He did not say, I'm going to hurt you or

2   I'm going to harm you or I'm going to kill you.

3   He did not say any of that stuff.

4      Q.    Did he by his actions threaten to harm

5   you?

6      A.    I believed that I was in danger.  I

7   believed that Darren Lea was in danger.  I

8   believed that Mr. Hale was drawing a firearm to

9   hurt us.

10      Q.    Okay.  What made you believe that?

11      A.    So when I opened the door and stepped

12   off the porch, there was an expression on his face

13   that is very difficult to explain.  It just made

14   me a little concerned, which that's when I think

15   the firearm was drawn.  He stood up from the

16   couch, and he was saying things, like, I'm coming,

17   I'm coming, I'm coming; but he wasn't really

18   coming.  He was just kind of standing there,

19   stalling.  He was looking around.  He reached his

20   hand into his left pocket, and he pulled out a

21   pack of cigarettes.

22          And then as I'm standing there giving

23   him commands to come out of the trailer, he takes

24   his pack of cigarettes, and he kind of holds them

25   out to the side, and he drops the cigarettes, and

1    he says, I'm coming, I'm coming, I'm coming, I'm

2    just going to get my cigarettes.

3         And he leaned way over where I really

4    couldn't see what he was doing.  I could kind of

5    see the bottom of his pants and his elbows moving

6    a little bit.  And as he stood back up -- you

7    know, as he stood up, this hand came into view,

8    and it was clear, and this hand came into view,

9    and it was clear.

10        And I think that's about the time when I

11   said, that can get you shot.  And I told him again

12   to come out of the trailer.  I don't think I said

13   "trailer."  I told him to come out.  And he again

14   said, okay, okay, okay, I'm coming, I'm coming,

15   I'm coming; but he didn't.

16        And he turned around completely away

17   from us and started messing around with his

18   waistband, turned back around.  And what I saw was

19   his hands up about shoulder height.  I thought he

20   was facing directly at me, but in reality, he

21   wasn't.  His hands were up about shoulder height,

22   and then he just all of a sudden slammed this hand

23   down into his pocket.

24        Q.   Okay.  You said he reached into his left

25   pocket to get a pack of cigarettes, or came out

1    with a pack of cigarettes.  Which hand did he

2    reach into his left pocket with?

3         A.    If you were me and looking at Hale, this

4    hand, which is my left hand, went down in the

5    pocket and then came back out with a pack of

6    cigarettes.

7         Q.    Did you shoot him then?

8         A.    I did not.

9         Q.    Did Sergeant Lea shoot him?

10        A.    He did not.

11        Q.    Did Sergeant Lea tase him?

12        A.    He did not.

13        Q.    When you say, he jammed his hand -- his

14   right hand down into his pocket -- where were his

15   hands positioned, again, as far as on his body or

16   in line with parts of his body before he --

17        A.    They appeared to me to be about shoulder

18   height.

19        Q.    Okay.  And so you describe it as he

20   quickly jammed his right hand into his right

21   pocket?

22        A.    Yeah.  It reminded me of -- I'm trying

23   to think of the term -- quick draw.  Like, if you

24   were watching an Old West movie and people were

25   practicing their quick draw, almost like Barney

1      this -- I'm going to make this a broader area

2      because I don't know exactly.  He was in this

3      general area.

4          Q.   And you can put his initials there just

5      so we can keep that clear.  All right.  So from

6      the angle where you're standing, you say that you

7      lost sight of Doug on the inside at one point; is

8      that right?

9          A.   Upper torso, yeah.  So he leaned off

10     this way (indicating).

11         Q.   Okay.  And so you lost track.  Did you

12     have sight of his right shoulder from where you

13     were standing?

14         A.   I remember seeing his shorts and his

15     elbows.  That's what sticks out in my head.

16         Q.   Okay.  What was he wearing?  You

17     mentioned shorts.  Can you elaborate on that?  I

18     mean, what was he wearing?  What did the clothes

19     look like?

20         A.   A baggy shirt, and I'm fairly certain it

21     was shorts.  I remember it looked like it had

22     cargo pockets, but it's been --

23         Q.   What part of his body was facing you

24     when you say he made the quick draw to his pocket?

25         A.   I thought he was facing straight on, but

1    in reality it had to have been more of his right

2    side, the oblique side.

3        Q.    Now, on these shorts, what type of

4    shorts are we talking about?

5        A.    I don't know what brand or anything.

6    They just seemed like they were just kind of

7    baggy, everyday shorts.

8        Q.    Okay.  Do you remember what color they

9    were?

10        A.    I can't recall at this time.

11        Q.    What did the pockets look like?

12        A.    The pockets looked really big.  Matter

13    of fact, when I was standing -- when we were

14    giving him commands and stuff and we're standing

15    here, I'm trying to make the best assessment that

16    we can.  So I look at his waistband area, and I

17    really can't tell anything there.  And then his

18    pockets seemed really baggy, so, you know, you

19    could easily conceal a small-framed handgun in

20    there.

21        Q.    Did you see a bulge in his pocket?

22        A.    No.  Because, again, they were very

23    baggy.

24        Q.    He did not have anything in his left

25    hand when you say he went for his right

1    pocket -- went to his right pocket with his right

2    hand?

3        A.    I don't know if he had anything in his

4    left hand or not.

5        Q.    Did he have a cigarette in his mouth?

6        A.    I don't remember.

7        Q.    How did he put down his pack of

8    cigarettes?

9        A.    He kind of held them off to the side,

10   like stiff armed, and dropped it.

11       Q.    And dropped them that way?

12       A.    Yeah.

13       Q.    Doug didn't physically attack you, did

14   he?

15       A.    He did not physically attack me, no.

16       Q.    He didn't physically attack Sergeant

17   Lea; is that right?

18       A.    That's correct.

19       Q.    Now, when Sergeant Lea discharged his

20   taser, did he give any type of warning to you that

21   he was going to fire that taser or discharge that

22   taser?

23       A.    He did not.

24       Q.    Have you been through taser training?

25       A.    I have.

1    Q.    Do they teach you during that taser

2    training about certain things, warnings to give

3    for your fellow officers when you discharge your

4    taser?

5    A.    There is training on what you're

6    supposed to do when you tase somebody, yes.

7    Q.    And what is that warning that you're

8    supposed to give?

9    A.    I don't remember the exact wording or

10   the entire phrase, but you're supposed to

11   announce, taser, taser, taser; and then in our

12   policy there is the "unless there are extenuating

13   circumstances," something to that effect.  Again,

14   I can't remember the exact phrasing, but that

15   follows that.

16   Q.    And what's that warning for?

17   A.    That warning is to let other officers

18   know that the taser is being deployed.

19   Q.    And why would that be prudent to let the

20   other officers know?

21   A.    For a couple of reasons.  One, you can

22   prepare your -- ideally what would happen is the

23   taser would be used.  The person would feel the

24   full effects of the taser and allow the backup or

25   additional officers to make an arrest while that

1   solo police officer, I had in-house training, had

2   the basic academy, and then I had an FTO program.

3   Actually, I think the FTO program hired new-hire

4   class.  FTO, basic academy, and then I came back

5   for, like, a week or two of FTO, and then I got

6   cut loose.

7       Q.   What does "FTO" stand for?

8       A.   Field training officer.  It's a field

9   training program, basically, so you're riding with

10  a more experienced officer.

11      Q.   Where was the academy?

12      A.   It was at USM Gulf Park.

13      Q.   Is that in Long Beach?

14      A.   It is.

15      Q.   And how many weeks is that?

16      A.   I think it was nine weeks at the time.

17      Q.   Have you ever been disciplined while you

18  were employed with Biloxi PD?

19      A.   Yes.

20      Q.   For what?

21      A.   Vehicle accident, and I had an incident

22  where I got written up for failing to properly

23  search a prisoner.

24      Q.   Have you ever discharged your firearm

25  prior to April 1st, 2015?

```
 1          A.    I'm assuming that you're talking about
 2    outside of training?
 3          Q.    Of course, outside of training, in the
 4    line of duty.
 5          A.    One time.
 6          Q.    And when was that?
 7          A.    It was sometime just before Katrina.
 8          Q.    And what was that for?
 9          A.    A dog that was attacking some people.
10          Q.    Okay.  What kind of dog was it?
11          A.    A German Shepherd.
12          Q.    And where was it at?
13          A.    Kuhn Street or Laurel Street -- it was
14    either Kuhn Street or Laurel Court, which is East
15    Biloxi.
16          Q.    You shot the dog?
17          A.    I did.
18          Q.    Did you kill the dog?
19          A.    It died, yes.
20          Q.    Okay.  The car accidents, that stuff,
21    what did those involve?
22          A.    One of them I backed into somebody and
23    did no damage and got written up.  One I was in a
24    vehicle pursuit in kind of a low car and went over
25    a dip in the road and caused some damage
```

1    underneath.  One I had a prisoner escape from the

2    back of the car; and when I started chasing the

3    prisoner, I apparently neglected to put the car

4    into park, and it rolled across the street.  I

5    think that was all the vehicle ones.

6         Q.    When was that, the incident involving

7    the prisoner?

8         A.    Right after Katrina.

9         Q.    For any of those instances, have you

10   ever been suspended?

11        A.    I was suspended for one day.

12        Q.    To your knowledge, have you ever had any

13   complaints lodged against you for use of excessive

14   force?

15        A.    Not for use of excessive force, not to

16   my knowledge.

17        Q.    Right.  To your knowledge, have you ever

18   had any other complaints lodged against you?

19        A.    There have been some other complaints,

20   yes.

21        Q.    What did those involve?

22        A.    One time right after Katrina there was a

23   lady that was on Highway 90 during a time when it

24   was restricted.  And I told her that the place was

25   under curfew, and in reality, it was limited