IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

SOUTHERN DIVISION


ALLEN DOUGLAS HALE, III,
    Plaintiff,


VERSUS          CIVIL ACTION NO: 1:16-cv-113-LG-RHW


CITY OF BILOXI, MISSISSIPPI;
KENNETH GARNER, Individually;
DARREN LEA, Individually; and
JOHN AND JANE DOES 2-10,
Individually,
    Defendants.


<u>DEPOSITION OF DARREN LEA</u>

Taken at Biloxi Public Safety Building,

170 Porter Avenue, Biloxi, Mississippi,

on Wednesday, November 2, 2016, beginning at

9:15 a.m.


**EXHIBIT**
tabbies "D"

1      Q.   Were you employed as an officer in any

2  capacity before Biloxi?

3      A.   Yes.

4      Q.   And who was that with?

5      A.   With the United States Coast Guard.

6      Q.   And when were you serving with the Coast

7  Guard?

8      A.   I've been serving with the Coast Guard

9  since August 31st, 1987, until present.

10     Q.   Okay.  So you're still with the Coast

11  Guard, as well?

12     A.   Yes.

13     Q.   In what capacity is that?

14     A.   I'm a special agent with the Coast Guard

15  investigator service.

16     Q.   And other than the Biloxi Police

17  Department, have you ever worked for any law

18  enforcement agency, local law enforcement agency?

19     A.   No.

20     Q.   What type of training did you receive

21  before you became employed with the City of

22  Biloxi?

23     A.   Law enforcement training with the Coast

24  Guard, just basically general law enforcement

25  training, instructor for use of force, instructor

1    first I've learned of that, so can you kind of
2    give me just a brief background on the type of
3    courses that you taught?
4         A.   Just use of hand-to-hand type of -- I
5    lost my train of thought there -- physical,
6    defensive tactics type stuff, use of impact
7    weapon, pepper spray or chemical weapons.  And I
8    was not a firearms instructor, but I did train on
9    firearms, the use of deadly force as far as the
10   practicality of it, or when and when not to use
11   it.  I was also a judgemental pistol instructor.
12        Q.   A judgemental pistol instructor?
13        A.   Yes.
14        Q.   What exactly is that?
15        A.   Officers or Coast Guardsmen at the time
16   would watch a video, and the video was somewhat
17   interactive.  And you had to make the proper
18   choices on when to shoot and when not to shoot,
19   and I administered those courses.
20        Q.   Did they have tasers available back in
21   '97?
22        A.   No.
23        Q.   To the best of your recollection, when
24   did Biloxi Police Department issues tasers to its
25   officers?

1    A.    Roughly five years ago.  I don't have

2    the exact date on that.

3         Q.    So approximately 2010-ish or '11?

4         A.    Yes.

5         Q.    And do you recall what you had to do to

6    be able to carry a taser when you were on duty?

7         A.    I had to go through classroom training

8    on it, talked about the nomenclature, proper uses

9    of it, the physiological effects, the dangers, and

10   then completed a practical where we actually fired

11   the taser into a cardboard silhouette with

12   specific target areas; and then we also had to be

13   subjected to the taser so we would know what it

14   feels like.

15        Q.    And what does it feel like?

16        A.    Feels like somebody hitting you in the

17   back with a ball pein hammer a thousand times in

18   three seconds.

19        Q.    You know, do you lose all motor

20   function?

21        A.    I didn't.

22        Q.    Is that the purported goal in using a

23   taser, is to basically have a suspect to where

24   he's not able to, you know, physically move,

25   basically?

1          MR. GUNN:  Object to the form.

2     BY MR. HOLDER:

3          Q.   I'll rephrase that.  Let me ask you this

4     first.  How many times have you deployed your

5     taser?

6          A.   I'm pretty sure it's three times, at

7     least when I've discharged it.

8          Q.   And specifically I'm referring to

9     discharging at a suspect.  So three times?

10          A.   Yes.

11          Q.   Do you recall -- obviously in the

12     instant case was one -- when the other two

13     incidents were?

14          A.   The one prior to this one was probably a

15     month before, and then the other one was several

16     years ago.

17          Q.   So they were both prior to this

18     incident?

19          A.   Yes.

20          Q.   And you haven't deployed your taser at a

21     suspect since April 1st, 2015?

22          A.   No.

23          Q.   What all positions have you held with

24     the Biloxi Police Department?

25          A.   Patrolman, went up through the ranks all

1  and purposes, the taser is on at that point in

2  time?

3      A.   And the camera.

4      Q.   And it takes a little time to warm up?

5      A.   No.

6      Q.   No?  So as soon as you pull the trigger,

7  it will discharge the taser bars?

8      A.   I'm not sure I understand.  As soon as

9  you turn the taser on, the camera comes on, and

10  then you have to physically pull the trigger for

11  the trigger -- for it to discharge.

12      Q.   Okay.  And when does the camera stop

13  recording?  Is it when you turn the taser off?

14      A.   I'm not 100 percent on that, but that

15  would be my thought.

16      Q.   Have you ever viewed the taser videos of

17  your previous?

18      A.   Yes.

19      Q.   Okay.  And, you know, were those about

20  the same length as the one here, or do you recall?

21      A.   No.

22      Q.   How did you first come to learn of the

23  arrest warrant for Mr. Hale?

24      A.   Dispatch said that we had some

25  information about Mr. Hale being up at this

1  trailer park -- or this RV park.  All of my north
2  units were very busy at the time, so we didn't
3  have anybody to go over there to follow up with
4  it.  I was on another call, another felony call;
5  and about the time that cleared up, I started
6  heading up that direction.  If I ain't mistaken,
7  Sergeant Garner was also en route, and one of our
8  captains was heading that way.
9          As soon as I said I was heading that
10  way, the captain dropped off.  And then as I was
11  coming from this side of town to the north side of
12  town, one of the units from the north -- that
13  would have been Officer McKeithen -- he also
14  joined up with us.
15      Q.   Did y'all meet somewhere prior to going
16  to the RV park?
17      A.   Yes, we met at the commercial tire shop
18  right there at Interstate 10 and Shriners
19  Boulevard.  Sergeant Garner had his mobile data
20  terminal there.  We looked at a photograph of
21  Mr. Hale, and we had some preplanning-type issues
22  that we wanted to go over.  And we kind of had the
23  inkling that the initial address that the
24  dispatcher had given us was not going to be the
25  right address.  Sergeant Garner believed that that

1       "L" to represent himself.

2  BY MR. HOLDER:

3      Q.  From what direction did y'all approach?

4  Would that be the front door of the trailer?

5      A.  I think so.  That looks like the RV.

6      Q.  RV.  And from what direction did y'all

7  approach the RV?

8      A.  Draw it on there?

9      Q.  Yeah, you can draw it.

10      MR. GUNN:  Draw where the cars are?

11  BY MR. HOLDER:

12      Q.  You can just do a dotted line or

13  something, if you want to, or a line with an

14  arrow.

15      A.  I'm not sure where McKeithen was.  It's

16  not to scale.  And that's Garner, and we

17  approached this way.

18      Q.  And when is the first time that you made

19  contact with Mr. Hale?  And when I say "contact,"

20  the first time you made a visual observation.

21      A.  From right here at the front of this

22  car, I could see him sitting here.  I'd looked

23  through the front window, and I could see him

24  sitting there; and that was the same person I saw

25  in the picture that I had just looked at.

1            MR. HOLDER:  Correct.

2       A.   I think Sergeant Garner did.

3 BY MR. HOLDER:

4       Q.   I believe you had mentioned earlier that

5 previous to this incident that night, that you

6 were serving another felony warrant; is that

7 right?

8       A.   Yes -- not a warrant.  It was a felony

9 arrest.

10       Q.   Do you recall what that was for?

11       A.   Narcotics.

12       Q.   Did y'all effectuate the arrest?

13       A.   Yes.

14       Q.   Did the suspect in that case try to run

15 or anything like that?

16       A.   No.

17       Q.   Was there any use of force in that case?

18       A.   No.

19       Q.   I'm going to hand you what's marked as

20 Exhibit 4.  It's policies and procedures on arrest

21 procedures.

22            MR. CLARK:  Can we get a copy of what

23      he's marked up?

24            MR. GUNN:  Yeah, it's going to be

25      attached.

1       Q.   Did anybody have the warrant with them?

2       A.   No.

3       Q.   In Paragraph 3, can you read that for

4  me?

5       A.   Verbally advise suspect they are under

6  arrest so a reasonable suspect will know that

7  they're under arrest and not free to leave.

8       Q.   And isn't it true that Mr. Hale was

9  never notified he was under arrest?

10       MR. GUNN:  Object to the form.  You can

11      answer.

12       A.   I do not recall if we actually -- if

13  anybody actually told him he was under arrest; but

14  it was clear that we wanted him to come to us, but

15  he would not comply.

16  BY MR. HOLDER:

17       Q.   Okay.  Did you ever tell him he was

18  under arrest?

19       A.   No.

20       Q.   Did you ever tell him that you had a

21  warrant for his arrest?

22       A.   No.

23       Q.   Did Garner ever tell him that he had a

24  warrant for his arrest?

25       A.   I don't know.

1      A.    Yes.

2      Q.    How?

3      A.    By his movements, not following task

4    direction.

5      Q.    But he's not informed that he's under

6    arrest; right?

7      A.    No.

8      Q.    And he's in his own home?

9      A.    Yes.

10      Q.    So what lawful order or what authority

11    did you have to -- for him to be compliant with

12    anything?

13           MR. GUNN:  Object to the form.

14      A.    The arrest warrant.

15    BY MR. HOLDER:

16      Q.    Which he was not informed of?

17      A.    Not necessary.

18      Q.    It's not necessary to inform him of that

19    despite the fact that the procedures tell you

20    that?

21      A.    He would be told that as soon was we got

22    him in handcuffs, when it was safe for everybody

23    at the scene.

24      Q.    Was there a reason why you didn't just

25    put him in handcuffs?

1      A.   Well, that's what we were attempting to

2   do.

3      Q.   Did he ever curse?

4      A.   I don't recall.

5      Q.   Did he ever yell at you?

6           MR. GUNN:  Object to the form.

7           MR. HOLDER:  I don't know how else to

8       ask that question.

9      A.   His voice was raised a little bit.

10  BY MR. HOLDER:

11     Q.   Was this before or after he got shot?

12     A.   Before.

13     Q.   Would you agree that the minimum force

14  necessary is required when effectuating an arrest?

15     A.   Yes.

16     Q.   At one point in time, I think you said

17  that you had your firearm drawn; is that right?

18     A.   Yes.

19     Q.   Do you remember when you holstered your

20  firearm?

21     A.   Mr. Hale made a very sudden movement

22  with his hands out of our sight -- out of my

23  sight, anyway, and when he came back, he had a

24  cigarette -- he had a pack of cigarettes.  I had

25  my gun pointed at him, prepared to use deadly

1   force if necessary.  It was not a weapon.  I think

2   Sergeant Garner said something to the effect, hey,

3   that's how people get shot.  He said, I'm just

4   getting my cigarettes.

5           And then I transitioned to my taser.  I

6   holstered my gun, got my taser out, and told him,

7   if you do that again, I'm going to tase you.

8       Q.   Okay.  So you holstered your weapon

9   because you didn't fear that you were in danger of

10  serious bodily harm?

11          MR. GUNN:  Object to the form.

12      A.   No.  I wanted a secondary option based

13  on the fluidity of the circumstance.

14  BY MR. HOLDER:

15      Q.   Is there any reason why you just didn't

16  tase him then?

17      A.   As soon as I pulled my taser out, it

18  pretty much happened.  It was very quick.  I

19  didn't have a taser out initially.

20      Q.   Did either one of y'all -- for

21  clarification, Officer Garner or yourself or

22  Officer McKeithen -- when y'all instructed

23  Mr. Hale to come outside, tell him why you wanted

24  him to come outside?

25      A.   I don't think.  I don't recall

1   specifically, no.

2        Q.   Is there any indication that y'all just

3   wanted to talk to him or had some questions?

4        A.   Yes.

5        Q.   Y'all said, we have some questions for

6   you?

7        A.   No.

8        Q.   Okay.  And I believe I've asked this,

9   but I'm going to ask it again, so sorry for the

10  redundancy if I have.  Did you or Garner or

11  McKeithen ever ask him, are you Allen Douglas

12  Hale?

13       A.   No, not that I'm aware of.  I don't

14  recall it.

15       Q.   Can you describe for me or define

16  "active resistance"?  That's been the term that's

17  been utilized by I believe yourself and other

18  officers in describing Mr. Hale's behavior.

19       A.   He was not following task direction even

20  though we had weapons, that be guns, tasers or

21  whatever, pointed at him.  He refused to follow

22  task direction even though we gave him

23  consequences.

24       Q.   What's the difference between active

25  resistance and passive resistance?

1      A.   Not following -- physically not

2  complying; and passively not complying is, like,

3  passively somebody won't get up when we tell them

4  to.  He was kind of in between a passive and an

5  active the way he was initially acting.

6      Q.   So he wasn't all the way into full

7  active resistance?

8      A.   He went there eventually.

9      Q.   Okay.  Well, this all happened really

10  quickly; right?

11      A.   Yes.

12      Q.   Okay.  So at what point in time did he

13  pass the passive resistance continuing into the

14  active resistance realm?

15      A.   The active resistance started when he

16  made that first reach, you know, with guns pointed

17  at him telling him to come here, making that

18  further reach -- not further, but that sudden

19  reach out of our sight.  That's when I feel that

20  my life was potentially in danger.

21      Q.   Did you ever tell any of the

22  investigators that you thought your life was in

23  danger?

24      A.   I don't recall.

25      Q.   I mean, wouldn't that be something that

1  would be the first thing you'd tell them, if you

2  felt like your life was in danger?

3          MR. ROS:  Objection.  Argumentative.

4      A.  I react to what I see; and if I'm

5  reacting, it's based on trying to protect myself.

6  BY MR. HOLDER:

7      Q.  Would you agree that you told the

8  investigator in an interview that you tased him

9  because he was being non-compliant and not because

10  you feared for your safety?

11      A.  To me, that's kind of both.  I was

12  trying to address the situation.

13      Q.  Well, would you agree that you told him

14  that you tased him because he was non-compliant

15  and never mentioned that you feared for, you know,

16  your life or serious bodily harm?

17      A.  Well, I certainly said that, that I

18  tased him for being non-compliant.

19      Q.  And would you agree that in your

20  policies and procedures -- if you want to, you can

21  turn to Page 4 in Exhibit 4 there -- in

22  Paragraph 3, active resistance behavior, and it

23  gives examples, fighting, struggling, or

24  attempting to flee, so would that be accurate?

25      A.  So you're just asking about Number 4?

1    Q.   Paragraph 3, when it's talking about

2    active resistance behavior and it provides kind of

3    a definition or examples of that type of behavior,

4    can you tell me what it says?

5         A.   It says, if suspects demonstrate

6    active-resistant behavior such as fighting,

7    struggling, attempting to flee, officer may use

8    reasonable force to complete the arrest.  However,

9    officers are reminded that the force used to

10   apprehend a suspect should be adjusted accordingly

11   after the arrestee has been subdued and/or

12   handcuffed.

13        Q.   And did Mr. Hale ever attempt to fight?

14        A.   Not directly, no.

15        Q.   Did he ever tell you he was going to

16   fight?

17        A.   No.

18        Q.   Were y'all ever struggling?  Was there a

19   physical struggle?

20        A.   No.

21        Q.   Did he attempt to run?

22        A.   No.

23        Q.   Or any other type of escape?

24        A.   To me, he was evaluating his options.

25        Q.   He wasn't just getting a cigarette?

1     A.   No.

2     Q.   He told you he was going to get a

3 cigarette; right?

4     A.   Yes.

5     Q.   And that's exactly what he did, didn't

6 he?

7     MR. ROS:  Object to the form of the

8     question.  It's argumentative and leaving out

9     facts.

10     MR. GUNN:  Just ask questions.

11     MR. HOLDER:  I am asking a question.

12     MR. GUNN:  That wasn't a question.  That

13     wasn't a question.

14     MR. HOLDER:  It was a question.

15     MR. GUNN:  No, it was not.  It was not a

16     question.  That's an argumentative statement.

17     Ask him a question.

18     MR. HOLDER:  Don't talk to me like that.

19 BY MR. HOLDER:

20     Q.   Did Mr. Hale tell you that he was going

21 to get cigarettes or getting a cigarette?

22     MR. GUNN:  Thank you.

23     A.   After he grabbed the initial pack of

24 cigarettes.

25 BY MR. HOLDER:

1        Q.   And did he grab a cigarette?

2        A.   I don't know.

3        Q.   You don't remember if he had a

4  cigarette?

5        A.   I don't know.

6        Q.   What exactly were you looking at when

7  this was going on?

8        A.   Him not following hard task.

9        Q.   Did you ever see a cigarette in his

10  mouth or left hand?

11       A.   No.

12       Q.   So you weren't looking at his left hand?

13       A.   I was looking for weapons.

14       Q.   Did you ever see a bulge in his pocket?

15       A.   No.

16       Q.   When you tased him, you know, what was

17  he doing?  At the instant you pulled the trigger

18  or deployed your taser, what was he doing?

19       A.   Reaching down towards his waistband.

20       Q.   He didn't put his hand in his right

21  pocket?

22       A.   I just saw him reaching towards his

23  waistband.

24       Q.   You watched the video, you said; right?

25       A.   Yes.

1      Q.   And wouldn't you agree that it's pretty

2 clear that he had his hand in his right pocket?

3      A.   I don't recall that part.  I just

4 saw -- I reacted to tasing because he made that

5 movement down real fast.

6      Q.   When you say "real fast," I mean, can

7 you describe that for me?

8      A.   It looked like a very quick movement

9 towards his waistband in order to go after a

10 weapon, and that's when I felt like my life was in

11 danger.

12      Q.   And did he tell you that he was going to

13 get a lighter?

14      A.   I don't recall.

15      Q.   You don't remember that, either?

16      A.   No.

17      Q.   Would that have made any difference to

18 you?

19      A.   No.

20      Q.   How far away was he?

21      A.   Probably four, five feet.

22      Q.   How far does that taser shoot?

23      A.   Twenty-five feet.

24      Q.   Okay.  So this isn't going to be real

25 clear for the record, but I'm just trying to get a

1    inform every suspect that they're under arrest, do

2    you check yes, or do you check no?

3        A.    Well, I check yes.  And this is the way

4    this happens.  If I have a warrant for your

5    arrest, I walk up to you; I take control of you

6    and tell you you're under arrest.  I don't come up

7    there and say, sir, you're under arrest, and give

8    you an opportunity to resist.  I take control of

9    you first.  It's all a fluent motion.

10       Q.   By "take control," you would handcuff

11   me?

12       A.    I would take control of you physically

13   and then handcuff you so I can get my hands on you

14   so that I don't have to chase you down or

15   something to that effect.  So, yes, everything you

16   say is correct, but it's kind of a fluent,

17   all-in-one motion situation.

18       Q.   Did you have a body camera on that

19   evening?

20       A.    I did.

21       Q.   Was it turned on?

22       A.    No.

23       Q.   Do you remember if you turned it on

24   after the incident?

25       A.    I did.

1    Q.   If you closed your eyes and deployed

2  your taser, would you know exactly what it was?

3    A.   Yeah.

4    Q.   And during your taser training, do they

5  instruct you to give any type of advance notice

6  prior to discharging or deploying your taser?

7    A.   Yes.

8    Q.   Can you describe that for me?

9    A.   You're supposed to give the suspect

10  advance warning, you know, of the consequences; if

11  they don't comply, we're going to tase you.  If

12  you decide to tase, you give a warning, "taser

13  taser, taser," to let everybody know.

14    Q.   And did you give that warning here?

15    A.   I did not have an opportunity to.

16    Q.   Do you know if he was tased first or

17  shot first?

18    A.   It was pretty much simultaneously, so I

19  don't know the exact.

20    Q.   All right.  Now, after he was tased and

21  shot, can you tell me what happened next?  Were

22  you involved in removing Mr. Hale from the

23  trailer?

24    A.   Sergeant Garner removed Mr. Hale and got

25  him on the ground and got him handcuffed, and then

1    communicate. And I would have testified before I

2    saw the video that I said it, but I did not say

3    it.

4         Q.   Have you ever been convicted of a

5    felony?

6         A.   No.

7         Q.   Misdemeanor?

8         A.   No.

9         Q.   Have you ever been suspended or placed

10   on probation by the Biloxi Police Department?

11        A.   Probation, but that's all for minor

12   crashes.

13        Q.   Vehicle accident?

14        A.   Yes.

15        Q.   Damaging City property?

16        A.   Yes.

17        MR. GUNN:  Running over a pothole?

18        THE WITNESS:  Yes.

19   BY MR. HOLDER:

20        Q.   Any citizen complaints against you in

21   the last five years or so?

22        A.   I'm sure there are. Not that I'm

23   specifically aware of. Some of them make it all

24   the way up. Some of them don't.

25        Q.   Have you ever discharged your firearm at

1    a suspect?

2        A.   No.

3        Q.   Did you have video on your patrol

4    vehicle?

5        A.   No.  It was a back-up unit.  It was

6    non-operable.  I said "non-operable."  It was

7    non-existent.  Excuse me.

8        Q.   There was just no video in that car at

9    all?

10       A.   Correct.  It was an old Crown Vic,

11   back-up K-9 unit.

12       Q.   Your interview with Investigator Brown,

13   was that your first interview?

14       A.   Yes.

15       Q.   Do you recall exactly when that was?

16   Was it the next day?

17       A.   Yes, next day.  I don't want to give a

18   time on it, but it was early.  I don't know what

19   time.  Sorry.

20       Q.   Had you ever seen Mr. Hale prior to

21   April 1st, 2015?

22       A.   No, not that I'm aware of.

23       Q.   Have you seen him, that you're aware of,

24   subsequent to April 1st, 2015?

25       A.   No.