1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3                    SOUTHERN DIVISION

4

5

6   ALLEN DOUGLAS HALE, III,
         Plaintiff,
7

8   VERSUS          CIVIL ACTION NO: 1:16-cv-113-LG-RHW

9

    CITY OF BILOXI, MISSISSIPPI;
10  KENNETH GARNER, Individually;
    DARREN LEA, Individually; and
11  JOHN AND JANE DOES 2-10,
    Individually,
12       Defendants.

13

14

15

16           DEPOSITION OF KENNETH GARNER

17

18      Taken at the Law Office of Russell S. Gill,

19      638 Howard Avenue, Biloxi, Mississippi, on

20      Tuesday, October 25, 2016, beginning at

21      1:44 p.m.

22

23

24

25

Schroeder-Lanoux Reporting & Legal Video, In[c]
(228)875-2684 - www.schroederlanoux.com

EXHIBIT
1

1    Q.   What kind of criminal history did you

2    find out that he had?

3    A.   They were unable to really tell me

4    anything because it was not their case.  The case

5    investigator was not there.  It was locked away in

6    his office, and all they had was what little bit

7    of stuff we had in our Record Management System.

8    Q.   And what was in the Record Management

9    System?

10   A.   The warrant for credit card fraud; and

11   he had a picture from some incident before that,

12   and I don't recall what that was.

13   Q.   Do you remember the names of the two

14   officers or the officer that you spoke with or the

15   investigator on that?

16   A.   Yeah, it was Investigator Steve

17   Schlicht.

18   Q.   Do you know how to spell Schlicht?

19   A.   I don't really know.  He has since

20   retired.

21   Q.   Okay.  Did you have any information

22   available that Doug might have a history of

23   violence?

24   A.   Again, like I said, all they had was a

25   little bit of information in record management;

 1   and I don't recall them saying anything about any

 2   prior violent offense.

 3       Q.   Do you have the ability to run an NCIC

 4   report on somebody?

 5       A.   You talking about a criminal history?

 6       Q.   Yes.

 7       A.   We do.  We do have that.

 8       Q.   Did you run a criminal history check on

 9   him?

10       A.   I did not.

11       Q.   Now, tell me about prior to your arrival

12   at the Mazalea RV Park where the incident

13   occurred.  In your own words, tell me what

14   happened when you were first contacted or informed

15   about his arrest warrant.

16       A.   I was at the police department doing

17   something with reports or computers or something.

18   Dispatch called me and said that a person that

19   lived at Mazalea RV had called and said that he

20   was there and that he had a warrant, and they told

21   me that they had verified he had an active felony

22   credit card warrant.

23       Q.   And why did they contact you about that?

24       A.   I was one of the supervisors that were

25   working.  Basically, they called the desk phone,

1    and I happened to be sitting at the desk.

2        Q.   Okay.  What was your next step after

3    that?

4        A.   I made sure, you know, verified and

5    confirmed the warrant, and I told them to send

6    three officers up there when one became available.

7        Q.   Were any officers available?

8        A.   We were a little bit busy at the time,

9    so it was a minute before anybody was available.

10       Q.   Okay.  And who ultimately became

11   available?

12       A.   After I finished what I was doing, I

13   decided to go up to the RV park; and ultimately it

14   ended up being me and Darren Lea, another patrol

15   sergeant, and Robert McKeithen, who is a patrol

16   officer.

17       Q.   Did you speak with either Darren Lea or

18   Robert McKeithen on the phone or on the radio

19   prior to meeting with them in person?

20       A.   Yeah, we met at Southern Tire Mart,

21   which is just right there by the trailer park.

22       Q.   How far away from the trailer park was

23   that?

24       A.   I'm pretty sure the property butts up to

25   each other.

1          Q.    What crime was Doug accused of in the
2    arrest warrant?
3          A.    Credit card fraud.
4          Q.    Would you classify that as a violent
5    crime?
6          A.    I would not.
7          Q.    Are you a K-9 officer currently?
8          A.    Yes, I currently have a dog, yes.
9          Q.    Were you a K-9 officer on April 1st,
10   2015?
11         A.    I was not.
12         Q.    So obviously you did not have a K-9 with
13   you?
14         A.    I did not.
15         Q.    Was Darren Lea a K-9 officer on
16   April 1st, 2015?
17         A.    He was.
18         Q.    Did he have his K-9 with him?
19         A.    I believe so.  It would be very unusual
20   for him to be at work and not have his dog.
21         Q.    Did he use his dog during the service of
22   this arrest warrant?
23         A.    No, he did not.
24         Q.    Why didn't he use the dog during the
25   service of the arrest warrant?

```
 1              MR. GILL:  If you know.

 2              THE WITNESS:  I'm sorry?

 3              MR. GILL:  If you know.

 4              THE WITNESS:  I don't know what his

 5         particular reason was, but I could tell you

 6         what my reasoning would have been for not

 7         using it as a K-9 handler.

 8    BY MR. SMITH:

 9         Q.   Sure.

10         A.   For one thing, like you said, it was a

11    nonviolent crime.  The other is the small RV that

12    he was in.  You know, a police dog is incredibly

13    intelligent, but he's still just a dog.  So even

14    if it would have been justified for Mr. Hale to be

15    bit by the dog, sometimes other things could

16    happen where someone who didn't have any reason to

17    be bit could be bit.

18              So that would be one of the reasons I

19    wouldn't use the dog in this instance.  It's just

20    the confines, not knowing who else was in the

21    small RV.

22         Q.   Okay.  Now, when y'all got to Mazalea RV

23    Park, which lot did you go to?

24         A.   We initially went to the wrong lot.  We

25    initially went to I believe it was Lot 29.  And my
```

1    understanding of what happened is that the person

2    who called about Mr. Hale lived at 29, and whoever

3    the call taker at dispatch was entered that number

4    as the lot where Hale was.  But when we looked at

5    the Record Management System, it showed his

6    address as Lot 26; so we knew there was an error

7    somewhere.  So that's where we initially went, was

8    Lot 29.

9         Q.    Did you talk to the person who lived at

10   Lot 29?

11        A.    I did not.

12        Q.    Okay.  How did y'all realize that that

13   was the incorrect lot?

14        A.    I ran the tag that was in the little

15   driveway area, and it came back to the person who

16   was listed on the screen as the reporting party.

17        Q.    That's the gentleman, I guess, who

18   describes himself as a bounty hunter?

19        A.    Yeah.

20        Q.    How far away was Lot 26 from Lot 29?

21        A.    I don't think I can approximate it for

22   you.  That trailer park is laid out strangely.  So

23   this lot was on, like, the main road, and then

24   Mr. Hale's lot was on another crossroad that

25   connected.  Two north-south roads were connected

1    small trailer park asking about him, I was fairly

2    certain that information had gotten to him.

3           So when we got to Lot 26, McKeithen was

4    first, and then I was second, and Darren was

5    behind us.  And we started to execute the plan

6    that we had formulated, which was that McKeithen

7    went around, I guess, the driver's side, would be

8    a better description, and Darren and I began to

9    approach the door.

10    Q.    Okay.  What happened as you started to

11    approach the door?

12    A.    This area is pretty dark at night.  So

13    McKeithen was in front of me and off to the right

14    a little bit, and I could see the windshield of

15    the RV.  And there was a screen that was pulled

16    down over the windshield, but the lights were on

17    inside the RV which allowed me to see into the RV.

18    And I could see Mr. Hale sitting by a window on

19    the left side.

20           So McKeithen was already –– by the time

21    I realized this was fairly close to rounding the

22    side.  And, of course, like I said, it was pretty

23    dark, so he took his –– he had his flashlight in

24    his hand, and he did what was called painting the

25    area with light.  So he just kind of turns his

1    that investigators had been in this small RV park

2    asking about him for days, I made the inference, I

3    guess is the word I'm looking for, that he was

4    probably aware that he had a warrant because of

5    how small the area was and how he -- in my

6    experience as an investigator, once you start

7    asking about people that you're looking for, they

8    become aware of it very quickly.

9            So when he looked out the window, I'm

10   not saying that the sight of the flashlight made

11   him think the police were there.  I said, my

12   thought process was that he was probably aware he

13   had a warrant and was probably a little more alert

14   to people being around the trailer.

15       Q.   Okay.  But you never confirmed with

16   anyone that told you that Doug knew he had a

17   warrant?

18       A.   I never spoke to anyone who said that

19   they knew that Doug knew he had a warrant.

20       Q.   Okay.  So this was just your assumption

21   that he knew that there was a warrant out for him?

22           MR. GUNN:  Object to the form.

23       A.   Again, like we said earlier, there's

24   decisions that are made, and a lot of those

25   decisions are based on training and experience.

1   to recall.  Not very far.

2       Q.   Okay.  Which way did the door open?  Did

3   it swing in to, basically, your left or in to your

4   right when facing the RV?

5       A.   I don't remember if it swung in or out.

6       Q.   What happened when you opened the door?

7       A.   We began to give Mr. Hale the commands

8   to come out of the RV.

9       Q.   What did you say?

10      A.   I said "police department."  I said

11  "come out."  I said "keep your hands out of your

12  pockets."  I think I said "keep your hands out of

13  your pockets" several times.  I said "come out"

14  several times.  That's pretty much what I recall

15  saying.

16      Q.   What did Sergeant Lea say?

17      A.   The only thing I really remember Darren

18  saying was initially he said that he had lethal

19  cover, and then later he said -- he told Mr. Hale

20  that he would tase him if he didn't comply.  Not

21  in those exact words, but that's the gist of what

22  he was saying.

23      Q.   When did you draw your firearm?

24      A.   I had stepped off the porch -- to the

25  best of my recollection, I had stepped off the

1    he says, I'm coming, I'm coming, I'm coming, I'm

2    just going to get my cigarettes.

3              And he leaned way over where I really

4    couldn't see what he was doing.  I could kind of

5    see the bottom of his pants and his elbows moving

6    a little bit.  And as he stood back up -- you

7    know, as he stood up, this hand came into view,

8    and it was clear, and this hand came into view,

9    and it was clear.

10             And I think that's about the time when I

11   said, that can get you shot.  And I told him again

12   to come out of the trailer.  I don't think I said

13   "trailer."  I told him to come out.  And he again

14   said, okay, okay, okay, I'm coming, I'm coming,

15   I'm coming; but he didn't.

16             And he turned around completely away

17   from us and started messing around with his

18   waistband, turned back around.  And what I saw was

19   his hands up about shoulder height.  I thought he

20   was facing directly at me, but in reality, he

21   wasn't.  His hands were up about shoulder height,

22   and then he just all of a sudden slammed this hand

23   down into his pocket.

24        Q.   Okay.  You said he reached into his left

25   pocket to get a pack of cigarettes, or came out

1    with a pack of cigarettes.  Which hand did he

2    reach into his left pocket with?

3         A.    If you were me and looking at Hale, this

4    hand, which is my left hand, went down in the

5    pocket and then came back out with a pack of

6    cigarettes.

7         Q.    Did you shoot him then?

8         A.    I did not.

9         Q.    Did Sergeant Lea shoot him?

10        A.    He did not.

11        Q.    Did Sergeant Lea tase him?

12        A.    He did not.

13        Q.    When you say, he jammed his hand -- his

14   right hand down into his pocket -- where were his

15   hands positioned, again, as far as on his body or

16   in line with parts of his body before he --

17        A.    They appeared to me to be about shoulder

18   height.

19        Q.    Okay.  And so you describe it as he

20   quickly jammed his right hand into his right

21   pocket?

22        A.    Yeah.  It reminded me of -- I'm trying

23   to think of the term -- quick draw.  Like, if you

24   were watching an Old West movie and people were

25   practicing their quick draw, almost like Barney

1    Fife on the Andy Griffith Show when he was

2    standing there and practicing.  That's what it

3    reminded me of.

4         Q.   Did you shoot first, or did Sergeant Lea

5    discharge his taser first?

6         A.   I am not 100 percent certain.  I did not

7    hear my gunshot.  I heard the taser.

8         Q.   Okay.  Had you been drinking alcohol on

9    April 1st, 2015, before encountering Doug?

10        A.   No.

11        Q.   Were you taking any types of medication?

12        A.   No.

13        Q.   Were you depressed about anything?

14        A.   No.

15        Q.   Were you experiencing anxiety about

16   anything?

17        A.   No.

18        Q.   Were you under a doctor's care for

19   anything?

20        A.   No.

21        Q.   Were you participating in any type of

22   counseling or therapy?

23        A.   No.

24        Q.   Now, from MBI, Mississippi Bureau of

25   Investigation, who interviewed you after the

1   pocket -- went to his right pocket with his right

2   hand?

3        A.   I don't know if he had anything in his

4   left hand or not.

5        Q.   Did he have a cigarette in his mouth?

6        A.   I don't remember.

7        Q.   How did he put down his pack of

8   cigarettes?

9        A.   He kind of held them off to the side,

10  like stiff armed, and dropped it.

11       Q.   And dropped them that way?

12       A.   Yeah.

13       Q.   Doug didn't physically attack you, did

14  he?

15       A.   He did not physically attack me, no.

16       Q.   He didn't physically attack Sergeant

17  Lea; is that right?

18       A.   That's correct.

19       Q.   Now, when Sergeant Lea discharged his

20  taser, did he give any type of warning to you that

21  he was going to fire that taser or discharge that

22  taser?

23       A.   He did not.

24       Q.   Have you been through taser training?

25       A.   I have.

1        Q.    Do they teach you during that taser

2   training about certain things, warnings to give

3   for your fellow officers when you discharge your

4   taser?

5        A.    There is training on what you're

6   supposed to do when you tase somebody, yes.

7        Q.    And what is that warning that you're

8   supposed to give?

9        A.    I don't remember the exact wording or

10  the entire phrase, but you're supposed to

11  announce, taser, taser, taser; and then in our

12  policy there is the "unless there are extenuating

13  circumstances," something to that effect.  Again,

14  I can't remember the exact phrasing, but that

15  follows that.

16       Q.    And what's that warning for?

17       A.    That warning is to let other officers

18  know that the taser is being deployed.

19       Q.    And why would that be prudent to let the

20  other officers know?

21       A.    For a couple of reasons.  One, you can

22  prepare your -- ideally what would happen is the

23  taser would be used.  The person would feel the

24  full effects of the taser and allow the backup or

25  additional officers to make an arrest while that

1    person was under the influence of the taser.  And

2    it's also to prevent accidental discharge.

3        Q.    Now, I think I've seen in some of the

4    reports about you mentioning that you were waiting

5    on Sergeant Lea to tase Doug for being

6    noncompliant.  Is that accurate?

7        A.    Yes.

8        Q.    Do you remember who you made those

9    statements to, who you told that to?

10       A.    I believe I told that to Investigator

11   Shoemaker, which is our internal affairs

12   investigator, and Investigator -- or I guess he's

13   an agent, Smith.

14       Q.    Okay.  And is that the policy and

15   custom, to tase someone who's being noncompliant?

16       A.    Again, like we talked about before,

17   sometimes there's a tactically good reason for

18   tasing somebody.  I didn't want to go in his

19   trailer, and there's a lot of reasons for that.

20   Some of them are things I learned at a basic SWAT

21   school.  Some of them are things I learned from

22   working with an assistant of the U.S. Marshals

23   Service.

24           So what I learned in the basic SWAT

25   school is these type of structures are very

 1    differently, there could have been a different

 2    outcome; but we're talking about April 1st of

 3    2015, and we're sitting here in October of 2016.

 4    You know, I did the best I could with what I had.

 5    BY MR. SMITH:

 6         Q.    Did Doug ever point a weapon at you or

 7    pull a weapon on you?

 8         A.    No.

 9         Q.    What's your date of birth?

10         A.    7/17/1975.

11         Q.    What's your approximate height?

12         A.    About six foot.

13         Q.    And what's your approximate weight?

14         A.    About 220.  It fluctuates.

15         Q.    Do you know how big Doug was?

16         A.    No.

17              MR. ROS:  What was that?

18              MR. GUNN:  How big Doug was.  Why don't

19         you restate your question?

20    BY MR. SMITH:

21         Q.    Do you know how tall Doug was?

22         A.    No.

23         Q.    Do you know how much he weighed?

24         A.    No.

25         Q.    Where did you go to high school?

1          A.    Gulfport High School.

2          Q.    Did you graduate from high school?

3          A.    I did.

4          Q.    What year?

5          A.    1993.

6          Q.    What kind of post high school education

7     do you have, if any?

8          A.    I went to the University of Southern

9     Mississippi School of Music, but I did not finish.

10         Q.    How many semesters did you finish or

11    complete?

12         A.    I think I stayed for four semesters.  I

13    probably got two semesters.

14         Q.    What kind of training did you go

15    through, just generally, before you were sworn in

16    as a law enforcement officer?

17         A.    Before I was sworn in as a law

18    enforcement officer, what kind of law enforcement

19    training?

20         Q.    Yes.

21         A.    I had no law enforcement training.

22         Q.    Before you were put on duty, did you go

23    to the academy?  Did you go to any kind of

24    training courses, anything like that?

25         A.    Yes.  Before I was put on the road as a

1   had a warrant for him, did you?

2       A.   I don't remember saying that we had a

3   warrant for him.

4       Q.   Do you remember him asking what y'all

5   wanted him for?

6       A.   I remember him saying that, yes.

7       Q.   Okay.  Did you tell him?

8       A.   I don't remember telling him, no.

9           MR. SMITH:  I think that's it.  We're

10          good to go.

11          MR. GUNN:  No questions at this time.

12          MR. ROS:  No questions from the City.

13          MR. GILL:  No questions.  We reserve

14          reading and signing.

15                     – – –

16              (Exhibit 7 was marked.)

17                     – – –

18       (Deposition concluded at 3:36 p.m.)

19

20

21

22

23

24

25