1  **IN THE UNITED STATES DISTRICT COURT**
2  **FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
3  **SOUTHERN DIVISION**
4
5
6  **ALLEN DOUGLAS HALE, III,**
       **Plaintiff,**
7
8  **VERSUS**        **CIVIL ACTION NO: 1:16-cv-113-LG-RHW**
9
10 **CITY OF BILOXI, MISSISSIPPI;**
   **KENNETH GARNER, Individually;**
   **DARREN LEA, Individually; and**
11 **JOHN AND JANE DOES 2-10,**
   **Individually,**
12     **Defendants.**
13
14
15
16
17 <u>**DEPOSITION OF DAVID SHOEMAKER**</u>
18 Taken at Biloxi Public Safety Building,
19 170 Porter Avenue, Biloxi, Mississippi,
20 on Wednesday, November 2, 2016, beginning at
21 10:56 a.m.
22
23
24
25

Schroeder-Lanoux Reporting & Legal Video, Inc.
(228)875-2684 - www.schroederlanoux.com

EXHIBIT 6

1  know if -- he didn't see the shooting.  When he
2  came around front, he still observed, I believe,
3  Sergeant Lea with the taser prongs still in Doug
4  but did not actually witness the shooting itself.
5      Q.   Okay.  Did he see Sergeant Lea actually
6  deploy -- excuse me -- discharge his taser?
7      A.   That, I don't know.  He just told me
8  that he saw the taser with the prongs still from
9  the taser to Doug.
10     Q.   Okay.  Did he tell you whether he found
11 any weapons at the scene?
12     A.   Did not find any weapons.
13     Q.   Did he find any other kind of
14 paraphernalia at the scene?
15     A.   Paraphernalia as in?
16     Q.   Any kind of illicit paraphernalia or
17 anything?
18     A.   No.
19     Q.   Did he find anything else of any
20 evidentiary value at the scene?
21     A.   No.
22     Q.   Somewhere in your report, and I believe
23 it's towards the end, you mentioned that
24 they -- "they" being someone -- recovered a blue
25 lighter in the area where Mr. Hale was shot.  Do

1 you know who recovered that lighter?
2     A.   There was three Gulfport crime scene
3 techs that actually responded to actually process
4 the scene, and it was actually one of the three.
5     Q.   Did you speak with the crime scene
6 techs, the GPD crime scene techs during the course
7 of your internal affairs investigation?
8     A.   I did.
9     Q.   When did you speak with them?
10     A.   It would have been the next day. Not
11 the night of, so --
12     Q.   So April 2nd?
13     A.   April 2nd.
14     Q.   That would have been when they told you
15 they found a lighter at the location where Doug
16 was standing?
17     A.   Yes, they found a lighter. We
18 eventually got reports from them, but yes.
19     Q.   Did Officer McKeithen communicate to you
20 that he ever spoke with Mr. Hale at any time
21 before the shooting?
22     A.   No.
23     Q.   Okay. After Officer McKeithen, what was
24 the next interview that you conducted?
25     A.   Would have been Sergeant Garner.

1 actually end?
2     A. You know, I don't recall now.
3     Q. Does it end after the shooting?
4     A. Yes.
5     Q. So it captured the entire incident, at
6 least from an audio perspective?
7     A. Yes.
8     Q. Now, Sergeant Garner mentioned to you
9 that Mr. Hale put his left hand into his left
10 pocket and came out with cigarettes; correct?
11     A. That is correct.
12     Q. And neither Sergeant Lea nor Sergeant
13 Garner shot Mr. Hale at the time he reached his
14 left hand into his left pocket; correct?
15     A. That is correct.
16     Q. Neither one of them tased Mr. Hale when
17 he reached his left hand into his left pocket;
18 correct?
19     A. Correct.
20     Q. Okay. Now, in your report, it says that
21 Hale leaned -- then leaned very far over out of
22 view and began moving around. What did Sergeant
23 Garner communicate to you about leaning over out
24 of view?
25     A. My opinion is that in the --

1  MR. SMITH: Okay. I'll rephrase.
2  BY MR. SMITH:
3      Q. Did you ask him how he was able to
4  follow it if it was such a violent jam?
5      A. I did not.
6      Q. And then he told you that as it entered
7  his pocket, that's when "I squeezed off the
8  round"; is that right?
9      A. That is correct.
10     Q. Did he tell you whether he heard
11 Sergeant Lea's taser go off before he fired his
12 gun?
13     A. He did say he heard -- remembered
14 hearing the taser.
15     Q. Now, the last line on what's been Bates
16 stamped COB-3, which is the third page of your
17 report, will you read that, the last sentence,
18 when asked?
19     A. When asked, Sergeant Garner said Hale
20 never threatened them in any way and just did not
21 comply with their commands.
22     Q. And that was in response to a question
23 that you asked him, asked Sergeant Garner?
24     A. Yes.
25     Q. All right. Now let's move on to

1  Sergeant Lea, and I'm not going to ask you
2  necessarily any direct questions about
3  him -- that's on Page 5 -- because I know that you
4  didn't interview him.  Just to confirm, it was
5  Investigator Michael Brown that interviewed
6  Sergeant Lea; correct?
7       A.   That's correct.
8       Q.   However, you have listened to the
9  recording of that interview; correct?
10      A.   Yes.
11      Q.   Why did Investigator Brown interview
12 Sergeant Lea instead of you?
13      A.   You know, honestly, I don't remember
14 what exactly at that specific time I was doing,
15 but I would have been busy doing something else.
16 And Investigator Brown worked with me in internal
17 affairs, so it wouldn't have been uncommon on a
18 case for him to interview someone, as well as me.
19      Q.   Okay.  And based on the report, the
20 interview with Sergeant Lea took place on
21 April 4th, 2015, at 1:40 p.m.; is that correct?
22      A.   That's correct.
23      Q.   And that is three days after the
24 incident; correct?
25      A.   That would be correct.

1  Q.   Now, who actually typed up the narrative
2  about the Biloxi PD internal affairs investigation
3  interview with Sergeant Lea?  Did you type that
4  up, or did -- and I've butchered this question,
5  but did you type that up, or did Investigator
6  Brown type that up?
7  A.   This particular one I would have typed
8  up.
9  Q.   And did you type that up based off of
10 the recording that you heard?
11 A.   Yes.
12 Q.   Okay.  Then I might be able to ask you a
13 couple of questions about it.  Sergeant Lea had a
14 body cam on the night of the incident, did he not?
15 A.   Yes.
16 Q.   Did he mention anything in his recording
17 or in the interview that you listened to about his
18 body cam, anything specifically?
19 A.   He did.
20 Q.   What did he say?
21 A.   He said that he forgot to turn it on.
22 Q.   Okay.  Did he turn it on at some point,
23 though?
24 A.   He said, after the incident, he thought
25 about it and turned it on.

1     Q. And where is that video recording now?
2     A. Of what he --
3     Q. Of his body cam.
4     A. To my knowledge, I don't have a video of
5 that.
6     Q. Do you know if he gave that recording to
7 Investigator Brown?
8     A. He would have given, yes, to
9 Investigator Brown when he did the interview.
10     Q. Let me ask you this: Did Investigator
11 Brown give you the audio recording of the
12 interview that he did with Sergeant Lea?
13     A. Yes.
14     Q. At that time, he did not -- Investigator
15 Brown I'm speaking of -- did not give you a SIM
16 card from the body cam of Sergeant Lea or any kind
17 of recording from the body cam of Sergeant Lea?
18     A. No, sir.
19     Q. Okay. Is there some sort of internal, I
20 guess, Biloxi PD server or system that various
21 video recordings from cases are uploaded onto, or
22 do they just burn straight to a disk off of the
23 recording device; do you know?
24     A. Yes, I do, depending on what recording
25 device.

1        Q. Let's talk about body cams.

2        A. No, sir, we do not.

3        Q. How are body cam videos preserved?

4        A. They should be downloaded and a CD, of

5 course, made immediately, and then a CD for if the

6 investigator needs one, and then we put one in

7 evidence.

8        Q. In an incident such as this, the body

9 cam video from Sergeant Lea would be important,

10 would it not?

11        A. Yes, sir.

12        Q. And I'll submit to you he says he turned

13 it on right after, and you said he told you that,

14 as well. Any idea where that video is?

15        A. To my knowledge, there is no video of

16 that. I know there's no video of the actual

17 incident; but to my knowledge, there's no video of

18 after the incident, either.

19        MR. ROS: You mean other than what we've

20      produced?

21        THE WITNESS: Other than what we've

22      produced, yes.

23 BY MR. SMITH:

24        Q. I'm not trying to insinuate somebody's

25 hiding anything. We're just trying to find out if

1  had a warrant. Did you hear on that that Mr. Hale
2  asked the officers, what did I do?
3       A.   I think he did ask that, yes.
4       Q.   Okay. And did the officers give him a
5  response, an answer responsive to that question?
6       A.   No, I don't believe they did tell him.
7       Q.   What did you review first, the dash cam
8  video or the taser video?
9       A.   Would have been the taser.
10      Q.   Okay. And how long is that video?
11      A.   Very, very brief. It's seconds.
12      Q.   Okay. Are you familiar with the
13 various -- and I'm speaking in general terms
14 now -- taser video recordings, and when does the
15 camera on a taser come on?
16      A.   Don't hold me to the seconds, but it's,
17 I want to say, seconds prior to. Then, of course,
18 they pull the trigger, and anything on that is
19 recorded.
20      Q.   Does it come on when they turn the taser
21 on? Is there an on and off button on that taser?
22      A.   And I should know this. It's a couple
23 seconds, maybe five seconds, if I'm not mistaken.
24 It's five seconds prior to the actual engagement
25 of the trigger.

1         A.    That's correct.
2         Q.    And, ultimately, at the end of your
3 investigation, internal affairs investigation, you
4 found that Sergeant Garner's actions were proper
5 based on what you looked at; correct?
6         A.    Correct.
7         Q.    Okay.  Let me ask you this:  You had an
8 opportunity, you mentioned earlier, to review the
9 taser video; correct?
10        A.    Yes, that's correct.
11        Q.    And when you view videos in any kind of
12 investigation, you do accurate reports based upon
13 your viewing; correct?
14        A.    Correct.
15        Q.    Accurate written reports.  Okay.  And
16 you go into detail on those reports; is that
17 right?
18        A.    Correct.
19        Q.    And that's what you did in this case;
20 correct?
21        A.    Correct.
22        Q.    Still looking at Exhibit 2, Page 7,
23 under Video Review of Sergeant Lea's Taser
24 Camera -- it's at the top of Page 7 -- the
25 second-to-last line of the first paragraph you

|   |   |
|---|---|
| 1 | write, and then Hale turns back towards |
| 2 | them -- "them" being Sergeant Lea and Sergeant |
| 3 | Garner -- and places his right hand into his |
| 4 | right, front pant pocket, and he is then |
| 5 | immediately tased by Sergeant Lea and shot by |
| 6 | Sergeant Garner simultaneously. |
| 7 | You did not write that he jammed and |
| 8 | violently put his right hand into his right |
| 9 | pocket; correct? |
| 10 | A.  Correct. |
| 11 | Q.  Because that's not what you observed; is |
| 12 | that correct? |
| 13 | A.  I'm not saying that's not what I |
| 14 | observed.  That's just not the, I mean, verbiage. |
| 15 | That was his verbiage. |
| 16 | Q.  His verbiage, but you did not observe a |
| 17 | jamming, violent jamming of his hand into his |
| 18 | right pocket, did you? |
| 19 | A.  I observed him definitely put his hand |
| 20 | in his right pocket.  "Violently," again, that's |
| 21 | not the word I would use. |
| 22 | Q.  All right.  Turn back to Exhibit 7 now. |
| 23 | That's the policies and procedures.  That's where |
| 24 | you are right there.  If you'll look at Page 6 of |
| 25 | that under the heading -- it's about midway |