1　　　IN THE UNITED STATES DISTRICT COURT

2　　　FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

3　　　　　　　SOUTHERN DIVISION

4

5

6　ALLEN DOUGLAS HALE, III,
　　　　　Plaintiff,

7

8　VERSUS　　　　　CIVIL ACTION NO: 1:16-cv-113-LG-RHW

9

10　CITY OF BILOXI, MISSISSIPPI;
　KENNETH GARNER, Individually;
　DARREN LEA, Individually; and

11　JOHN AND JANE DOES 2-10,
　Individually,

12　　　　　Defendants.

13

14

15

16
　　　　30(b)(6) DEPOSITION OF CITY OF BILOXI

17
　　　　　DESIGNEE: JOHN B. MILLER

18

19　　　Taken at Biloxi Public Safety Building,

20　　　170 Porter Avenue, Biloxi, Mississippi,

21　　　on Wednesday, November 2, 2016, beginning

22　　　at 2:40 p.m.

23

24

25

EXHIBIT
10

1      Q.   And would you want to tell them that
2  they're actually under arrest?
3      A.   Sometime during the arrest, yes.
4      Q.   Would you agree that's even more
5  important when you're at somebody's home?
6      A.   Sure.
7      Q.   And, you know, where it's italicized
8  there, where it says, under arrest so a reasonable
9  suspect will know, is that italicized for a
10  reason?  Is that for emphasis?
11      A.   Sure.
12      Q.   And all of your officers are trained on
13  this particular policy?
14      A.   Yes, they are.
15      Q.   And if they were serving an arrest
16  warrant on Mr. Hale and did not advise him of a
17  warrant or that he was under arrest, would that be
18  a violation of that policy?
19      A.   Well, it would depend.  I mean, it
20  doesn't say if -- the first thing you have to do
21  during an arrest is, you have to gain control of
22  the situation itself.  So it doesn't say that you
23  immediately tell them.  It says that you advise
24  them that they're under arrest.  And eventually,
25  without a doubt, that will take place, but the

1    first thing and key, number one thing is to get

2    control of the situation.

3       Q.   Okay.  But it does say to verbally

4    advise them that they're under arrest?

5       A.   Sure.

6       Q.   And in Paragraph 1 where it says, use

7    caution, planning, and establish techniques to

8    help reduce dangers to officers and suspects, in

9    planning, how exactly do you plan to serve an

10   arrest warrant to help reduce dangers?

11      A.   Well, it would depend on the situation.

12   It would depend on the warrant.  It would depend

13   on many, many, many things.

14           In this particular case, if I'm not

15   mistaken, they did plan.  They stopped before they

16   got there.  They looked at a photograph.  They

17   took their own, individual cars.  So there was

18   planning involved.

19      Q.   Okay.  And do you normally consider, you

20   know, the type of offense that the warrant is

21   being served for?  Does that go into your --

22      A.   Yeah, you would always consider that,

23   but you certainly would never allow yourself to

24   believe -- for instance, if you're going to arrest

25   someone on a simple misdemeanor warrant or

1  first thing and key, number one thing is to get
2  control of the situation.
3     Q.  Okay.  But it does say to verbally
4  advise them that they're under arrest?
5     A.  Sure.
6     Q.  And in Paragraph 1 where it says, use
7  caution, planning, and establish techniques to
8  help reduce dangers to officers and suspects, in
9  planning, how exactly do you plan to serve an
10  arrest warrant to help reduce dangers?
11     A.  Well, it would depend on the situation.
12  It would depend on the warrant.  It would depend
13  on many, many, many things.
14        In this particular case, if I'm not
15  mistaken, they did plan.  They stopped before they
16  got there.  They looked at a photograph.  They
17  took their own, individual cars.  So there was
18  planning involved.
19     Q.  Okay.  And do you normally consider, you
20  know, the type of offense that the warrant is
21  being served for?  Does that go into your --
22     A.  Yeah, you would always consider that,
23  but you certainly would never allow yourself to
24  believe -- for instance, if you're going to arrest
25  someone on a simple misdemeanor warrant or

1  something, you would never allow yourself to
2  believe that there's anything that's standard or
3  there's -- your senses should be lessened because
4  of the type of offense.
5     Q.  Are there any exceptions to Paragraph 3
6  where they don't have to verbally advise them that
7  they're under arrest?
8     A.  No.  I mean, you would always tell them
9  eventually.  At some time or another, you'd have
10  to advise them that they're under arrest.
11        Again, you would want to gain control of
12  the situation first.  I mean, the arrest -- the
13  actual arrest procedure isn't just the beginning
14  of the arrest.  There's a long procedure there
15  that takes place.
16     Q.  And I understand that's leading to the
17  actual physical arrest.  To gain control, would
18  you agree that, you know, telling them they're
19  under arrest is a good way to do that?
20     A.  Sure.  I'm not going to disagree that's
21  a good way to do it.  You know, you have to take
22  other things into consideration, too, I mean,
23  whether a person knows that they're under arrest
24  or they should know that they're under arrest.
25     Q.  And do you train your officers on the

1  difference between active and passive resistance?
2     A.  Sure.
3     Q.  Can you kind of tell me what the
4  difference between active and passive resistance
5  is?
6     A.  Sure.  Passive resistance would be if
7  someone is resisting you but they're not becoming
8  animated or angry, if you will; and then
9  naturally, if it's aggressive, then it would step
10  up the level.
11     Q.  Okay.  So if somebody's somewhat
12  confused or argumentative or just verbally, you
13  know, saying things, that's more passive
14  resistance?
15     A.  It is more passive.  Again, that would
16  never be something that you would let your guard
17  down.  People are passive resistant about
18  something many times when they're trying to bide
19  time in order to give them time to decide what
20  their next move is going to be.
21     Q.  And active-resistance behavior, would
22  that be fighting?
23     A.  It could be, yes.
24     Q.  Struggling or trying to run type of
25  thing?

1     A.  Yes.
2     Q.  So some type of physical manifestation
3  of, you know, a physical threat or, you know,
4  fighting, that type of thing?
5     A.  Sure.
6     Q.  Are your officers, are they trained that
7  you're ever allowed to use deadly force when
8  there's just passive resistance?
9     A.  That wouldn't be something that you
10  would train.
11     Q.  That you would train?
12     A.  No, you wouldn't train to use deadly
13  force.  You use deadly force when you believe
14  deadly force is necessary, when you feel like
15  yourself or someone else is in imminent danger.
16     Q.  When did y'all -- when I say "y'all,"
17  I'm obviously referring to the department -- begin
18  issuing tasers to your officers?
19     A.  Oh, now you're asking me something that
20  I don't remember the date.  It's been quite a few
21  years.
22     Q.  Five years or so?
23     A.  Yeah.
24     Q.  What type of training is required before
25  a sworn officer is allowed to carry his taser out

1    stuff?

2        A.    There's some of both done.  A lot of

3    classroom.  There is some role playing

4    occasionally done.

5        Q.    And is all of that done in-house, as

6    well?

7        A.    Much of it, yes.  Keep in mind, we do

8    still send officers away to different schools, and

9    a lot of times they'll get some training there,

10   also.

11       Q.    If certain officers are found in

12   violation of these policies, do you send them to

13   additional training?

14       A.    Depends on what the violation is.  You

15   can't write a policy to cover every incident.

16   Just like not saying "taser, taser, taser," even

17   though we train that, that's not something that I

18   would discipline somebody over, simply for not

19   saying "taser, taser, taser."  If they tell

20   someone, I'm about to tase you, it's there.  What

21   they're trying to infer to them is there.

22            So you can't write a policy to cover

23   every individual instance, so we have to structure

24   our policies so that we're -- really the policy is

25   more for the officer, to give him a direction to

1   go and make him understand, or try to understand,

2   that this is what we expect out of this.

3        Q.   I understand.  And so what you're saying

4   is, you know, under no circumstances would you

5   discipline an officer for not saying "taser,

6   taser, taser"?

7        A.   Yeah, more than likely not.

8             MR. HOLDER:  Can we take a quick break?

9             MR. ROS:  Sure.

10                    - - -

11            (Off the record.)

12   BY MR. HOLDER:

13       Q.   All right, Chief Miller.  I'm going to

14   direct you to Interrogatory Number 13 and the

15   City's Responses to the First Set of

16   Interrogatories Propounded by the Plaintiff that

17   is on Page 7.

18            MR. ROS:  Sorry.  You're reading my

19       copy, which has my notes on it.

20   BY MR. HOLDER:

21       Q.   If you would, please, ignore his notes,

22   that would be great.

23            In response to any reprimands for

24   Sergeant Garner, about halfway down -- a little

25   more than halfway down, there is a -- and I'll